against the ITC, and Mr. Davies, your argument, please go ahead. Please, the floor is again yours. Judge Fleminger, I was reading the statute in that brief moment, and I can see your point, that the production requirement in 2 could be read into 3, so I don't want to... It's just not the way I've been thinking about it, but I could see how you could get there. It's not the way... It's really not the way the Commission has been reading it in the last few years. No, but it's your job, obviously, to interpret the statute. And as we talked about previously, as... But if you did read the production requirement into a licensed situation, you would have... And then you back off and you come and look at universities and research entities. It's clear that Congress meant to give, you know, a great university that does a lot of research and gets a good patent on giving... has at least standing to come in and complain. By imposing a production requirement, you say, in essence, to that great university, you're out of luck if you license your patent to somebody who doesn't produce, if all you get is revenue. That would seem to be irrational, wouldn't it? Well, I'm not sure it would be, because the goal is American jobs. And so if the university is... But if R&D and engineering count, then American jobs count in the lab. And the university had people in the lab, and they spent money on the lab. Yeah, if they could connect that up to the particular patent. So you would say they can get in court if they invested their money, bricks and mortars, in their engineering, but if all they had was revenue and licensing income, it wouldn't be sufficient? I think you can draw that distinction and think it's rational. When you put yourself in the shoes of Stanford University or someone like that. Stanford University has a patent, and it needs to show that jobs are coming out from their efforts, their investment in that particular patent. And there are multiple ways to do that. But the investment can be shown by licensing. That's what the statute says. The investment has to be in the licensing. Yeah, so say, for example, they license for $50 million to a particular licensee, and the licensee says, and it's a single patent license. So the patent is named, and somebody pays $50 million for it, and writes down a piece of paper, I'm paying $50 million so I can practice that patent. But there's no evidence that they ever used it. They decided to use the patent for offensive reasons. And you would bar that university from access to 337. I just haven't thought that through, Your Honor. I'm not sure... Well, that's what we need to do. If they've been... Probably the universal issue that's involved in this case is domestic industry, because that, depending on how we decide that, that will chart the course for everybody. It's a very important issue. Whereas the significant merits of the case involve the litigants, and we appreciate that. But that's why I'm pushing a little bit on the domestic industry issue. Yeah, I appreciate the pushing, Your Honor, and it may be just better to write an arrow opinion just on the particular issues that the parties have raised, and maybe save the tricky production issue, which is another briefing for a later day. If I may move on, is that okay? Yeah, yeah, I'm not... Okay. I know, I brought it up at the end. Before you get to what you want to talk about, I just have one narrow question that I think we can get rid of an issue, or possibly get rid of an issue. As I understand your patent exhaustion argument as it relates to the Samsung patent, you're relying entirely on the fact that the license itself refers to a worldwide license? Yes. But was there any evidence that, in fact, that there was any product that was sold in the United States under that license? No, but why would that matter? Sorry, I didn't ask Your Honor questions. It's my turn now. I know, sorry. When the Constitution provides inventors with a patent, the idea is to promote them to make an invention, and it's settled law that you get paid for your invention once. You get paid for your invention once. You don't get paid multiple times for the same invention from the same person. I know, but Fujifilm and Qantas were pretty specific about the fact that there has to be a sale in the United States. Fuji may have been. I don't believe Qantas was at all. And the Tessera opinion is actually. The deal is you get the right to exclude in the United States. Yes, and that one. The one people you catch at the borders on the 337. But you don't get the right to exclude somebody in Paris, France. Unless you purchase a worldwide license for $900 million, and then you bought that right. You've already been paid for that. They've already been paid $900 million for a worldwide license. Well, I gather that this was not pursued and that there was no evidence as to which domestic products included the components that had been acquired from Samsung. It came up very late in the day. It did come up very late in the day, because not for any party involved. This particular license was signed very late in the day. But I don't want to put too much weight on the exhaustion issue, although that's a large number. There are other really important issues. OK, proceed. And obviously, this court's very familiar with Rembrandt's spoliation issue. So let me start there. So in Micron 2, this court held, if it is shown that the spoliator acted in bad faith, the spoliator bears the heavy burden. And that's a direct quote from this court's Micron 2 opinion. And it was an if? If. And it was remanded? Exactly. So there isn't much there to rely on at this stage, is there? As a legal proposition, there is. But what I was quoting is now the law of this country, that if you destroy documents in bad faith, the burden shifts to you now. Add to bad faith the structure of documents to show that that did not prejudice the other side. And we are to review the bad faith determinations that were made in this case on a substantial evidence basis. Absolutely, Your Honor, just as we were talking about earlier. So unlike in Micron, where we remanded to ask the district court to say whether or not she really intended to say bad faith, we have a very specific finding of bad faith. Thank you, Your Honor. Those are some of my notes. The Micron decision lays out how you should evaluate a bad faith inquiry. And it's basically Well, it did shift the burden of proof. But I gather that you're asking us to make a de novo decision based on the change in the burden of proof of Micron 2? Well, we're at least asking for a remand, Your Honor, on the prejudice question. And I'll get to that in a second. But as to the fact that they destroyed documents, and as to the fact that they did it in bad faith, what the ALJ said here is the destruction was intentional and in bad faith. If the ALJ could rule on the bad intentions of a party, there is no question that Rambis could prevail. If you read the opinion, it's pages and pages of spoliation in bad faith. And then there's a paragraph where he says, reluctantly, I can't hold for NVIDIA here because I'm going to place the burden on NVIDIA. And that is just clearly wrong. Okay, so assuming that that was wrong. Yes. So the question is, if we remanded, how could Rambis ever satisfy its burden when there are factual findings in the record that says that they don't know what was destroyed? That's an excellent question for Mr. Jacobs. And I'll ask him that question, too, but I'm asking you. We're not sure. I mean, it certainly seems to me that the outcome there is going to be that they can't satisfy that burden. So in that sense, the court, I think, is free to do that. On the other hand, it's a little unusual for the court to do it, as Newman just mentioned, to do it in the first instance. Well, if it were a U.S. District Court case in front of a jury, we can decide there's no reasonable jurisdiction. Exactly, exactly. We've got a concession that there's no record of what was destroyed. And we have some cases in the Supreme Court where even the Supreme Court will do that just for judicially common reasons. Why put the parties through this exercise? But there is one. What about the language in the Micron II opinion that says a party must only come forward with plausible concrete suggestions as to what the destroyed evidence might have been? Yes, and we think we would. Well, is that a fact? Had you believed you've already done that? Or is that a requirement? Or is that something that goes away once there's been a showing of bad faith? No, there always has to be concrete suggestions. Because otherwise, it could be a completely different dispute. And no one wants to be charged forever because of the destruction here. We need to have... That's a separate fact question that you have to agree on and remand. I would assume that Ramblis would say, well, golly, we've got a fact finding by the ALJ that everything that NVIDIA asked for, we gave them. And so how can they possibly say that there's something else they need? Because we gave them everything in this litigation that they asked for. I don't think that's quite accurate, Your Honor. The ALJ, and I have four quotes here, their addendum 170 and 180, is clear that they destroyed documents. Ramblis destroyed documents from the patent prosecution attorney's file. Right, but if the point is, yes, they destroyed documents, but we gave you everything. When you come to discovery, you ask for what you need in order to litigate a case. Yes, Your Honor. You ask for a lot. And Ramblis' point would be, well, you asked for this. This is the stuff you felt was relevant. We gave it to you. So what if we destroyed a bunch of stuff that you didn't think was relevant enough to ask for? Well, two points. One, the ALJ is clear that we don't know what was destroyed. Some of it is just not known, so the burden would put that on Ramblis. But I can point you to appendix 31179, where the patent lawyer says he destroyed unique documents, unique emails. We emphasized in the briefing. I know what arguments you'll make if that issue is open on remand as to what concrete suggestions you might want in the files. This is about whether to remand or whether to do it. I mean, we're not taking a strong position on that, Your Honor. It's really a question. Well, the question is, what's the scope of the remand? If it goes back and the ruling is that we sustained the finding of spoliation, we sustained bad faith, and ipso facto, the burden of showing the lack of credit goes on them on the other side, then you have no role. I mean, they have a burden that they have to. You just sit there and say, my lips are sealed. Well, I mean, you may have a time. On the remand, if you have to go back and make a showing of plausible concrete suggestions as to what the destroyed evidence might have been, then that would be an issue for litigation. Sure, but I mean, I think on this record, how could we not possibly show plausible concrete suggestions? So the question is, are you going to pay the bills, put us through the exercise? I mean, I can't believe it. We could obviously show concrete suggestions. The burden is just about it. Is it enough of a concrete suggestion for you to simply say the prosecution files were destroyed and the parent application was pending at the time? Is that enough, or do you need something more? Oh, we have a lot more. I focused on this conceptual tree missing document because I find that very accessible. Mr. Barth is the inventor here. Outside of his office, he had a filing cabinet. He testified that he kept notes of both their pending applications and the way the industry was evolving so he could figure out which particular claims to prioritize prosecuting. It was a handwritten thing that he kept locked, and that draw was destroyed. And that would have been very useful. And the document that they've thrown up as being that doesn't have the Barth sentence on. It isn't handwritten. I was just thinking, as I recall, in Hynex 2, or in Micron 2, and in a sense also in the Hynex remand, the issue was not just the shifting of the burden to demonstrate that there would or would not have been prejudice, but also to consider whether the remedy actually is appropriately loss of the property or some intervening remedy. Is your sense that that issue would also be present here if we were to remand with a shift in the burden? It's very similar, Your Honor. Everybody has treated it as an on or off on terminating sanctions. There's nothing in the record suggesting any middle ground. But there is authority for middle ground. I'm not saying there isn't. And maybe the best thing to do is to send it back and see the appropriate sanction here. But remember, you need a sanction that will deter this type of behavior, a type of sanction that will deter destruction of millions of documents in advance of litigation in bad faith. It's not clear to me what possible sanction could work. Perhaps you don't need to argue that here. I agree. There's no record on it? No. I just have one quick question on this issue. Is the consideration of what would be the appropriate sanction different in the ITC given the weight of the government behind the injunction than it would be in a district court? I'm glad you brought that up, Your Honor, because I mean, I think it would. We are operating under a very extraordinary exclusion order. I mean, this court has recognized that that exclusion order is very damaging. The day it went into place, we started having to spend significant funds to ramp us. And we really feel that that exclusion order is unique, and it really should be vacated promptly. Because what we have here is a party that has destroyed documents in bad faith and is getting paid now because of that. And that's a daily thing that we have to suffer through. I'm not sure I quite got the question. Did the public interest component come into play? Yeah. Is a party acting even worse when they destroy documents as part of an ITC proceeding than they are in a district court proceeding? I think that there is a federal statute that makes it, I think, a crime to destroy documents as part of a federal investigation. And that would be in play, too. Your contention is that if we were to vacate the decision and send it back for further proceedings, we should order the limited exclusion order lifted, right? Yes, Your Honor. And I have a statutory point on that as well, Your Honor. So the limited exclusion order is based on the idea of an enforceable patent. And that's a 19 U.S.C. 1337 A1B. The idea is you have to have an enforceable patent to impose what this court has called and touched on an extreme and internationally provocative remedy. You have to have an enforceable order. So you're saying that we would, in fact, have to prejudge what the appropriate sanction would be. No, Your Honor. Because if, at the end of the day, they have an enforceable patent, you can put the exclusion order back in its place. If reasonable minds might think it's unenforceable because of the destruction of the document, you shouldn't lay the exclusion order down until you've answered that question. Thank you, Your Honor. Yeah, and promptly, because we are suffering. You kind of figured that one out. Are there any other points you want to raise? Please proceed. I have many more, Your Honor, but I don't want to overstay my welcome. Start with the most important. Let's start with Hynex, then, because we were talking about Micron. This court in Hynex, I think, made clear that if you are a member of a standard setting organization that requires you to disclose patents and you don't disclose Do you want to stay with the subject of whether they should not have destroyed documents or if there are any other issues? This is your standard setting organization. I had moved on to my second point, Your Honor, equitable establishment. This is for misbehavior from the standard setting agency. The ALJ made a specific finding that whoever is complaining about that behavior had to be a member of JDAC at the same time. Is that, you believe, that Hynex says, or if anyone says that that's not correct? No, Hynex doesn't speak to that, because Hynex was part of the So that's true? Yeah, absolutely. But the point of that requirement is reliance. It's to show that when I'm a member of a standard setting body, my behavior will change whether or not I'm told that one of the parties is hiding patents. But you have to be a member at the same time. The question, it's not about membership, it's about reliance. So the NVIDIA-built products, relying on these industry standards, had Rambus disclosed its patent application as it was supposed to, the industry, and therefore us, would have gone in a different direction. So you're saying that the ALJ's specific reliance on the finding that they weren't members of the organization was in error? In error in a legal sense, Your Honor. I'm not telling you that's factual. But yes, it's legal error. And it makes perfect sense. This is a patent trap, pure and simple, and we're a victim. If they're not a member, why did they have a duty to disclose? They had a duty to disclose to the industry standard setting organization. We are being sued for industry-compliant products. We wouldn't have made the industry, we would have made different products if the industry had known of these patents and gone in a different direction. So the fact that we weren't in the clubhouse, why would that matter? I mean, we have been damaged by this patent trap, just as if we were inside. Rambus was a member, correct? Rambus, absolutely. This court has now said, I think, three times that they had a duty to disclose pending applications. This BARF application was filed in 95, and we are being sued on BARF claims. So even if you're not a member of the group, you're just totally unrelated, you're a research person in a laboratory someplace, and you come up with an invention, if you want to enforce that against these industry standard rules, you've got to tell them about it? No, because that person is under a duty to disclose their patent applications. Rambus signed up to be a member of this industry standard setting organization. And what point in time? They joined in 1990, and in 1995, while they were still a member, they filed this application and didn't tell anyone. And this is a big point of distinction between the Hynex and the Micron case that I'd like to dwell on in just a second, that the argument didn't quite work in Hynex because this court emphasized that Rambus had disclosed a formal patent, hadn't disclosed other patents, but one patent had been disclosed to the industry. So the industry knew the written description. They didn't know the claims, but they knew the written description. And this court held that that was enough. But here, there was no similar, there's no different Barth patent that was disclosed to the industry. The whole Barth application, all these claims, all these patents, never told to the industry. Supreme Court. It was pending while they were a member, is that right? That's right, Your Honor. The first part. Yeah, it was pending, and they didn't tell anybody. It's not the type of behavior that promotes innovation. If people invest in industry standard-compliant products, thinking that the way is clear, and somebody who's part of that industry standard-setting group then brings suit. Years later, investments later, and then, of course, they can get a lot of money because people have a lot already invested in this standard. So the point was that when they filed the application, they were a member. They were. And, excuse me? They were a member, yes. When they filed the application? Ninety-five. I'm confused about the ALJ's finding. It was the parent. Yeah, so there's a lot of continuation practice, a lot of tailoring of claims. It's definitely confusing, Your Honor. But the basic point is they filed a patent application, which is what's allowing them to sue us now. While they were a member of an organization that required them to tell the public, tell the industry about that application, and they just didn't do that. Okay, you want to talk about your patents, or do we have time? I'm at your service, Your Honor. If you have questions. Anything else you think we need to know at this stage? Well, just on the obviousness issue, I don't want to overstay my welcome. You argued enablement below, but you didn't push it with the commission, and you're not pushing it here. It's not in our favor, Your Honor. The obviousness issue, and it's technical, and I don't want to pretend it's not, but I tried to simplify it for us all. There is a patent, the Farm Law 037, and the Bar 353 would use those examples. It's common ground that there's only one point of difference between those two patents. And if that point of difference is the same, then the patent is invalid because the Farm Law patent comes before it. You can't have another patent on the same invention. The only point of difference is the strobe signal and the external clock, whether the external clock operates as a strobe signal. So I've set that up. So the ALJ in this case said what a strobe signal does is it starts the data transfer. In Hynex, Ram has persuaded the district court that their external clock does exactly that. They said that the external clock signal governs the timing of the response to a transaction request. The transaction request could be, for example, data transfer. So their system has an external clock that along with the request packet functions as a strobe signal. It starts the data transfer. The external clock starts the data transfer in the Hynex reading of the Farm Law patent. That's a type of strobe signal, and this court's authority on genius and species, as you well know, renders that invalid. You cannot get a patent on something where you already have a patent of an example of it. So you're saying that the finding in Hynex that they urged on the district court was that it initiates, that the clock initiates the data sampling? It governs the timing, yes, Your Honor. Well, isn't there a difference between whether it governs timing or it actually initiates the data sampling? Well, governing the timing would include, I mean... All right, you think one encompasses the other? Yes, Your Honor. All right, so are you arguing that they are judicially a stop? We didn't put it in those phrases. I mean, this court can construe claims to no vote, so I wouldn't go that far, but if you look at Farm Law Claim 1, that's what it said. It says, sampling a first portion of the data synchronously with respect to a rising edge. I mean, it gets very technical, but I mean, it flows the same way. We just pointed to the Hynex reading of it because it seems particularly unusual for a party to have two interpretations of the same claim, and there was no response to that in the briefs. Okay. Let's hear... I contend for the moment. Yes, Your Honor. Let's hear from the other side. Let's have your rebuttal time. Thank you, Your Honor. Mr. Rasmussen. I think I have a lot to say in your court's indulgence. Hopefully, I'll have enough time to say it. We've spent a lot of time on domestic industry. We just spent some time on unclean hands. Is there something that you'd like me to begin with? Can you begin with that threshold question of domestic industry? If we were to say, for instance, that the patents were unenforceable or that they were invalid, for any reason, do we need to address the domestic industry? We do not. Section 1337 is not a jurisdictional statute. It sets out the requirements of a violation, prima facie requirements of a case. It's been a while since I've looked at the Supreme Court cases on this issue, but my recollection is that absent express jurisdictional language by Congress, the courts are not to treat statutes as jurisdictional. So it's the commission's... Domestic industry is an element of the case in light of failure to understand a claim. Exactly. You can call it jurisdictional in the same way that personal jurisdiction is jurisdictional, but it's waivable. It doesn't go to court. Given the confusion over the years in the commission's opinions about what test to use for establishing a domestic industry, doesn't the court have an obligation to clarify that? I don't think so. The commission is always engaged in a case-by-case approach on this issue, and to quote from a 1974 Supreme Court case, NLRB versus Bell Aerospace, which is... Like Garmin, the law now, is Garmin the test? They're tests. Requirements. The requirements look at all the totality of the circumstances, but if I could just have a short quotation from... When you say totality of the circumstances, the circumstances are listed the number of things you look at. Well, the statute is... Is production in the United States required with regard to licensing? No, it's not. And the commission would submit... Why isn't it? Well, the concept, first of all, section A3 says what it says, but even if that were ambiguous, the legislative history is quite clear that the 1988 amendments occurred in reaction to, among other things, the Gremlins case, which involved, I think it was Warner Brothers Studios, licensing of little gizmo dolls from the Gremlins movies. All of which, nearly all of which, probably all of which were made overseas, just little knick-knacks and paraphernalia. We also have from the 1980s... Somebody was making them. Well, someone was making it, but it wasn't being made in the United States, and that's what I interpreted Judge Clevenger's question to be. We also know from that legislative history that Congress was looking out expressly at non-practicing entities, universities, hospitals, and so forth. So it's never been the commission's position that Section A3 alone, or in connection with A2, requires a production requirement for licensing. If we were to say that the Garland test is the test that we're going to defer to under Chevron deference, or we're going to adopt because that's what we think the statute says, did that test get properly applied in this case? It did get properly applied in this case. And before I get there, the commission is entitled to make case-by-case determinations rather than engaging in substantive rulemaking. And that's what I was going to get at with NLRB versus Dow Aerospace. And whether there's a subjective... Excuse me, whether this is... They can't be arbitrary and capricious. They cannot be arbitrary and capricious. I suppose they have to be consistent in the criteria that they apply. They do, and if the commission in a later determination acts inconsistently, the commission, under cases like motor vehicles versus state farm, needs to explain its change of course. Under Chevron, there can be more than one permissible interpretation of a statute. And it's up to the commission to decide within the range. But here, it doesn't matter because it's all consistent. In Verman, the commission went out of its way to say where you have revenue-driven licenses, such as we have here, the commission gives less weight to the revenue-driven license in determining the domestic industry requirement. What does it mean to say less weight? Are you familiar with that language? I don't recall it exactly. Do you want me to quote it for you? I just got it here somewhere. They say less weight is the text. Although our statute requires us to consider all licensing activities, we give Pioneer's revenue-driven licensing activity less weight to coaxial cable connectors. That's at page 25 of the corrected public version of GARB. My recollection of that language is that the commission considers ancillary activities and expenses to licensing the research and development and so forth. They're talking about revenue-driven licensing activities, so is that the activities, not the dollar sums? The commission was assessing whether or not there was substantial investment, and they said when we're determining substantiality, we give less weight to investments that were made for non-production purposes. What I'd really like to express is the difference between the patent license at issue there and the patent license at issue here, and this gets to something that Judge O'Malley talked about a couple of arguments ago with my colleague, and if you'll just indulge me for a moment, in the instant investigation, we have a technology license with a very narrow, discrete field of use. For purposes of the BART patents, there are a number of these CIT licenses in the record. One of them setting forth the narrow field of use is at page A41426, and when we have a technology license with a discrete field of use and is showing that the asserted patent fits within that field, call it a blocking patent, call it an essential patent, but that you need to practice that patent in order to practice the field of use, it's likely that a domestic industry will be found as it was here. But is it correct? I thought you told us that there had been no investigation and no evidence as to whether the domestic industry actually produced the DRAMs under the patent or imported them and used them. It's not a requirement. I'll let Mr. Jakes discuss. Whether it's a requirement or not, I think you said that there was no record either way. I believe that's correct, but if Mr. Jakes wants to correct me on that, he can. I'm sure he will. Perhaps he will. It is not a requirement. If you're applying the TOTA to certain judges, presumably the commission still uses the musical instrument standard as well? I believe so, Your Honor, which is to say that sadly at the commission we refer to things by their investigation number. Number, I hear you. That's the one that says there is a bricks and mortar requirement with regard to A and B and 3, but not the C. That's still the commission's position. That's correct. In contrast to here where we have a narrow field of use for technology license. Let me just ask this question. How can I be sure that there was a substantial investment in licensing with regard to the patents in C? There's no testimony in this record at all from a licensee saying, I gave my money because I love this patent. I won't be able to use this patent. So there's a great large sum of money that's identified in the record as associated with Rambis' income, which all of it comes from licensing. But how can I know that a licensee paid a penny for any of these five licenses and the patents that are in C? The commission... Isn't it hypothetically possible that not a penny was spent by any licensee to make, use, or sell any of the five patents in C? Why is it hypothetically possible? It is hypothetically possible if you're going to treat this in like a joint and several sort of way. I mean, this is the sort of, the court dealt with these sorts of issues in different contexts. The commission is saying it's okay. You can have a technology license that doesn't identify the patents. You can have a portfolio license that's got a million patents in it. So long as the number is sort of big and somebody makes an argument that the licensee might, you know, have wanted to pay for that particular patent, that's enough. Well, I wouldn't characterize the record here that way. I would characterize the record as we have a narrow field of use. We have a showing that in order to practice that narrow field of use, and again, the field of use is, it's a page long of detail. In order to practice that field of use, you have to practice this patent. The where patents. Well, for each. For the where patents, there was one field of use with the XDR controllers, and for the BART patents, if I'm not mistaken. Is there a finding that you would need to practice the BART patents in order to have the other license? I didn't see that. Well, yes, because it was discussed in the order with regard to both the XDR and the CIT licenses. One corresponds to where, and one corresponds to BART. But the licenses were entered into before the BART patents were ever issued. Some of them were, and some of them were not, is my recollection. Everything except Samsung. Samsung was a patent license. Everything was, could you repeat your question? All the technology licenses that you're saying, or that Randy says we should focus on rather than the portfolio licenses, were entered into before the BART patents were issued. Isn't that right? My recollection, I don't recall the answer to that to Mr. Jakes. Okay. I'm assuming they worked. Assuming they worked, I don't think that that alone is enough. From Phillips in 2005 dealing... If that was the case, then what other evidence would there be that money was spent to practice the patents that were in existence when you paid the money? Well, money was spent, and I'm going to quote from Phillips, which deals with portfolio licensing in a different context of patent misuse. Thus, package licensing provides the parties a way of ensuring that a single licensing fee will cover all the patents needed to practice a particular technology and protecting against the unpleasant surprise for a licensee who learns after making a substantial investment that he needed a license to more patents than he originally obtained. I appreciate the practicality in the marketplace of a license without a lot of patents, and it makes a lot of sense, but the statute requires there be a showing of the patent concern, which means the patent in suit, and there was just one patent in suit, showing a substantial investment in licensing that patent. It does. And it seems to me that if you've got it in a mixed situation, I mean, this is a proof case. I mean, it's not presumably somebody could be put on the stand and say, I paid this amount of money for that particular license that's in the package. Now, it is a proof case, and we can't lose sight of the fact that NVIDIA chose to put on no proof here. It's something that we discussed at page 33, note 13, although the... Well, who's burdening it? The commission believes that Rambis established a prima facie case, and that NVIDIA then decided not to put on any defense. So the commission contends that... The commission believes that Rambis satisfied its prima facie burden here because it established a narrow technology field. It established that these practices, these licenses are practiced within that field, and that it's not a speculative leak to recognize that if the value is in the field of use, and the field of use can't be practiced without the asserted patent, then the patent has substantial value as part of the pool, and expenses can properly be attributed to that patent as part of that patent pool. Contrary to what you said, I understood NVIDIA to object to the so-called prima facie case by saying as a matter of law, it's not enough to have a general association of dollars to the patent that has to be specific. They say that now, that the commission disagrees with... Right, but if we agreed... If we agreed with NVIDIA and had said the commission was... It was really contrary to the statute because it reads the patent concern out of the statute, then... Well... Stan, you'd be wrong. We believe that the commission's interpretation of the statute, that a substantial investment in its exploitation can mean that with respect to a technology license, that the expenses can be attributed to all the patents in that license absent of showing from the respondent to the contrary. That's reasonable. Why would the commission say the opposite in Garmin? Well, Garmin was a very different... Let's get to Garmin. Garmin was a very different patent license, and we've done the best we can to provide as unredacted an opinion as we can. It was... It involved 1,600 patents across a very, very wide field of use that in some industries would have just been a cross-license for an entire... It would have been a license to an entire... All the entire patent holdings of a firm. And under those circumstances where there's broad patent licenses covering substantially unrelated technologies, substantial value cannot be presumed from any one patent. And the commission looked elsewhere under those circumstances. If it's a very broad license, the commission's going to look to see, for example, if licensees appreciated the asserted patent inclusion at the time of license. And those are the sorts of facts that the commission dealt with in the 694 investigation. The commission was certainly mindful of this case when it decided the later one. It cited this decision favorably several times, and the commission was aware of the decision here when it decided that. To the extent that the difficulties are because, you know, the commission does not operate with public trials and the records of the other investigation are not fully public, that's a struggle the commission deals with, but the licenses it deals with in trying to advocate to the court, but the licenses were very different. In any event, the record is what it is here, and although we're mindful of the fact that the court can and should look at other material, including subsequent material and the help, you know, of providing context, later commission determinations as a matter of administrative practice cannot make an earlier determination arbitrary and capricious. Other than the Mesalinga case, which I believe has now been issued. Issued on Tuesday. I can't find a case in which this court has ever addressed the requirements necessary in order to show a domestic industry. Are you familiar with any cases or jurisprudence? I've only been at the commission a couple of years. I don't have the institutional memory of some of my colleagues. I'm not aware of one as I stand before you. There's a wide body of law at the commission which is difficult for the public to get its hands on because these redacted opinions take out all the juice, and you really don't know how many dollars were spent in the laboratory or whatever. And you have some sort of data points. It would seem to me that it is an issue of law, but is it not? You're interpreting a statute, trying to decide what factors are necessary. Maybe this court ought to speak. It's an issue of law subject to Chevron, and the commission is fully entitled to make these case-by-case determinations. You get a little slippery slope when you say, we want Chevron to do whatever we feel like doing in the next case. And that doesn't give a whole lot of guidance to the parties that appear in court. I'm mindful of that. To quote the Supreme Court, I've been trying to get this through, and please don't begrudge me for forcing it now. It's doubtful, and this was in an NLRB case from 1974, but it is doubtful whether any generalized standard could be framed which would have more than marginal utility. The board, the NLRB, thus has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific character of the buyer's authority and duties in each company with regard to who's a managerial employee for the board. And the commission does not engage in substantive rulemaking like the NLRB. The commission chooses to proceed on a case-by-case basis. The facts here, the commission believes, are reasonable, and the facts in the other investigation, which is not the case here. Maybe what I'm going to say now I shouldn't say to the elephant in the room here. Maybe we shouldn't talk about it, but it seems to me that there are a number of litigants that are coming into your venue who are seeking an exclusion order which functions as an injunction who have been unable to do so if they were in a U.S. district court under eBay. So it strikes me that your client, so to speak, is now breeding a lot of types of cases in which you're able to give the relief that the Supreme Court has said shouldn't be given in a U.S. district court case. Well, this court has recognized that that's the case. And I'm just wondering whether that's something that is a factor that we need to think about when we are construing this statute and trying to decide what the test for a domestic industry should be. We'll have to figure that out. If need be, we can seek additional briefing or... Okay. I'm sure you've heard the concerns. Is there any other points that you want to bring to our attention? Well, that covers domestic... Can I ask you about the commission's authority with respect to remedies? If we were to find, given this micron, that the issue of exfoliation needs to go back and putting aside whether we also remand for purposes of seeing a parameter-satisfied burden under micron, what would be the available remedies to Commission B? The available remedies to the commission are... It's statutory. The commission has the authority to enter an exclusion order or cease and desist orders. I think that's it. So the commission's authority is to either tailor those orders or not to issue relief whatsoever. And what impact does the fact that there's a public interest component in the statute have with respect to that kind of decision-making? That is always taken into account by the commission. There's a list of factors that relate to the public interest that the commission is charged by Congress with considering. Whether this type of issue with unclean hands fits within that, I don't know, and I don't know how the commission would address this. It would be a question of first impression. Okay. Thank you. Let's hear from Mr. Jake Spann. Is there something else you need to add? Well, there's all the unclean hands stuff, which I haven't addressed. I've spent all my time on domestic industry and not on the spoliation issue. All right. Do you want to... You and Mr. Jake are on the same side of the plan, so... We are sort of... Could I just speak briefly on the issue? And we did explore that during the previous argument as well. I think that we... I think we have as much as we need to know. Okay. We'll see if there are any gaps after we finish with Mr. Jake. Okay. Mr. Jake and I don't necessarily align on everything with these issues. On spoliation? What's that? On spoliation? On spoliation. I would just like to... Well, I don't want to... I thought you were... I thought you two were... We substantially agree. I should make clear from the commission's perspective that the commission does not dispute that a finding of bad faith was made here. It's the commission's position that notwithstanding the fact that the burden was ostensibly placed on the wrong party, that as a matter of appellate review, it's NVIDIA's burden to show that there's no harmless error under the Supreme Court's 2009 case on Shinseki versus Sanders, and where it's been shown that everything has been produced that NVIDIA sought. It... NVIDIA has not made that a standard for harmless error. Thank you, Your Honor. Thank you, Mr. Rosenstock. You chomping at the bit? Good morning. May it please the court. A lot's been said about domestic industry, but I'd like to make just a couple of points. And they really concern Rambus's business. Rambus is in the research and development business. They do develop technology, and that's the point of the technology licenses. There are two different types. There are technology licenses and there are patent licenses. Administrative law judge in this case rely on technology licenses. And what those do is they give the manufacturers a design. They say, here's how to do it. Here's the information, the know-how, the actual design, put that in your products. And when you do that, you get a license under our patents. Those are the technology licenses. There are actual products made under those. The Sony PlayStation uses Rambus's technology. Those products are imported into this country. You're going to make those arguments, but is there evidence of that in the records? Sure, yes, there is. One of our witnesses had the Sony PlayStation in the hearing, and he testified about it. Then we link that to the patents. We showed, through claim charts, how claims of the Barth patents, for example, read on Rambus's technology, the design that was given to them. But that was the question, because I may have missed it as well. That is a practice in the United States not using components that are imported, and therefore, that wouldn't be involved in this action. I'm sorry, Your Honor, I don't understand. The domestic industry is not an industry that imports products from overseas. No, no. The domestic industry is Rambus's industry in licensing this technology. That's what I was asking. They license it around the world. All right, so it's not the licensing industry. That's what I wanted to clarify. The licensing industry is... Is there a manufacturing industry in the U.S.? There is not a manufacturing industry in the U.S. Okay. For example, the PlayStation is manufactured outside the U.S., but the licensing industry is here. Rambus is in California. They developed the technology here, and they license it around the world. And you're saying this basic technology that couldn't be practiced without reading on these patents? Without using the BART patents, and we established that through these claim charts that were introduced and not challenged. That's undisputed. We showed how a claim of each of the patents reads on Rambus's technology. That's the link. Now, there may be other patents that are used as well, so the question is, is our substantial investment in this licensing attributable to more than one patent? It is. But we shouldn't be punished for having more than one patent. If we were just a sole industry with a single patent, I suppose it would be easier to show. But I think trying then to divide it up among all the patents that might be used is unnecessary. That investment should be accredited to all the patents that are used, and it's a substantial amount. So you're saying that even if you have a patent portfolio of, say, 200, 300 patents, and really what everybody wants is the first one or the first five, that you'd be able to satisfy the substantial investment requirement with respect to the 249th, even if people just own the patents that don't really care much about it? Well, now you're shifting over to the patent licenses. The technology licenses, you get the design. It is what it is. You use it in the product, and it may use 10, it may use 20 patents. The manufacturer isn't getting a license because it wants the patents. It wants the design, and then with that, it gets a license of the patents. Just like a manufacturer, they're interested in selling a product that's covered by the patent, but it's not primarily motivated by the patent. But am I correct that the technology licenses were entered into at least before the BARS patents were issued? For the most part, yes, that's true. The applications were on file, though, and, for example, the concurrent technology, it was developed as a design, and then they filed patent applications on it. The BARS applications were an outgrowth of that. Same with the XDR, which is another more advanced technology that Rambus developed. The WER patents developed out of that, and they were filed for that. And you see you get a license under all the pending patents, patent applications that are needed to practice that. And if you look at the revenues under RGRAM, the Rambus technology, the revenues up through 2008, you can see the quarterly revenues that people were paying under to use this technology. Now, the patent licenses can present a different problem because you have a large portfolio. Maybe they're motivated to just take a license under one of the patents, but they get all of them. That's not really the issue we have to confront, and that's more of what was in the Garmin case where you had 1,600 patents, most of them outside the U.S. And as counsel pointed out, in that decision from the IPC, they did cite the Rambus case, this investigation, as an example of acceptable portfolio licensing where the patents were specifically linked, and we did that through the claim charts. I suppose I should talk about affiliation. Our basic point is we produce the documents. There has to be relevant documents that were destroyed. There are specific findings by the ALJ that you had no record of what was produced and that, I mean, of what was destroyed and that you did not know what was destroyed. If you do not know what was destroyed and that included patent files when these applications were pending, how can you say that you produced everything? How do you prove a negative with no evidence? I understand, Your Honor. There is some burden on the other side to go forward first with plausible concrete suggestions. You do not think that my client says that once you find bad faith that that burden shifts completely? Bad faith with respect to what? It does say you need plausible concrete suggestions before that burden shifts, before we have to come in and show an absence of prejudice. And that is because... Except where you have bad faith. Bad faith with respect to what? The bad faith findings in this case are about as strong as they can possibly be. I understand, Your Honor. And they come out of the DRAM cases, which are different cases on different products. And let's say we understand that RAMBUS had a duty to preserve documents for those cases based on this evidence. Now, we have patents that were issued much later. But the application for this patent was pending when those documents were destroyed. So documents relating to this application necessarily would have been destroyed, correct? No, that's not true. That's not what the records show. Now, they have suggested that we purge the patent application files, but the evidence shows that a copy was given to RAMBUS before that ever happened. And we have that file. And we have testimony that that file contains things such as attorney notes, things that are in our privilege log. You may wonder, well, if we had destroyed those, what difference would it make because they're not relevant evidence in the case anyway. There's no, excuse me, there's no argument there that they should have received those documents. We are in a tough position here, but there has to be some showing of relevance before we can be... Well, isn't that what happens on remand? No, Your Honor. Why should we be making that? You don't want us to make that fact finding we might make it against you. Then you wouldn't like it. Well, I would, I'd prefer a remand than that. Yes, I agree. But I don't think that we are in that position because here we have their plausible... Well, if NVIDIA can shoulder that burden, then your client has a problem. No question about that because then you have to try to prove the negative. Yes. And that would be difficult. Well, we would have to prove that there is a question. In the argument that went on before the LJ, there was you argued for a later point in time at which you had a duty to preserve. Yes. And you lost on that. I don't see you've actually appealed that fact. We have. We think that's... And so the spoliation factor, you're stuck with that, I believe. Well, I would... You're not arguing that there was no substantial evidence to support the spoliation nor the bad faith. This may be a matter of terminology, but when you say spoliation, to me that says we destroyed relevant documents and there hasn't been any showing of that. There has to be a plausible concrete suggestion as to what was destroyed. They've come up with these two examples and we've shown that we produced them. But when you admit that documents were destroyed... Yes. ...you admit you have no idea what was destroyed. You kept no record of what was destroyed and you didn't let people know what was destroyed. Right. How do you expect the other side to prove that something that was destroyed is something that they would have liked to have seen? There are ways to do that, Your Honor. Documents often refer to other documents. There's testimony that they can take through discovery. It's not simply a matter of imagining what documents might be out there. They have to come up with at least something that indicates there were relevant documents out there in the first place. Let's assume that defining bad faith is a burden entirely on you. Then what do you do to prove the absence of presence? There are several things we can do. One, we can show it's not relevant to any issue in the case. For example, JEDEC. The JEDEC issue, which I can get to, should be an open and shut case. We were only a member there  after the patent application was filed. The standard that was being talked about didn't come up until a year after we were gone. There can't be any JEDEC violation. If we destroy JEDEC-related documents, there's no prejudice. There's no fact-finding as it relates to those issues in the record because the ALJ went on early on the question of whether NVIDIA had to be a member at the same time. He did refer to the Infineon case, which does discuss those things. In particular, the DDR standard that's implicated here was not discussed until late 1996 that we were no longer a member by that time. The JEDEC's obligation is only to disclose something as it relates to a pending standard. There was no pending standard. The BART patents don't cover SD-RAM, which was the existing standard. They relate to DDR, which was discussed later. As I said, that would be an example of where we could show the absence of prejudice. They suggest that we destroyed some documents that were related to JEDEC. That's not true. We have tons of them and we have produced those as well, including all the other documents. Remember, you guys saved the ones that helped you and destroyed the ones that hurt you. Given that, having some documents, even if it's damaged, doesn't change the fact that others were destroyed. You're right. When we have a universe of relevant documents, it does rebut the suggestion that there are others  more harmful or different. Take the conceptual tree. This is something that came up late in the proceedings. If you look at the conceptual tree, you'll see that there are some documents   that haven't been destroyed. It doesn't relate to any issue in this case. There's no way this could possibly be relevant to something that has to do with claim construction or infringement or invalidity. That's how we show the absence of prejudice. As far as I'm concerned, we've already done that with their specific examples. We haven't shown that one, something that they asked for and specifically pointed out was destroyed that is relevant to this case. It may be, because we're not going to solve it here, but thinking that in Micron 2 and in Heidegg's, the matter was remanded that there is a certain weight towards treating them similarly. Well, I understand that, but the judge here did make a finding that there was no evidence and relevant documents had been destroyed. That is supported by substantial evidence. Whether or not he found Rambis' motivation in destroying documents related to the DRAM cases, different cases, different parties, different patents, whether or not that was true, it doesn't carry over to this case. That's also why we have challenged the finding on the anticipation of litigation. It has to be reasonably foreseeable. If you look at some of the indicators in the Micron case, such as whether the patents had issued, such as whether there were particular manufacturers who were known to be infringing, not the case, NVIDIA's product that's been accused in this investigation didn't come out until 2003. It's not really a surprise that there's not showing the relevant documents were destroyed because this was back in a time that really has nothing to do with this case. Anything else you need to tell us? I think that's it. Thank you. Okay. Now let's see. We're not quite finished. Mr. Davies, you have three minutes if you need it. Thank you. I do want to talk about domestic industry just a little bit more, but let me start with where Mr. Jakes ended. The idea that this record has an ALJ saying that no relevant documents were destroyed just doesn't hold up when you actually look at what the ALJ said. If you go to, for example, Addendum 170, all of the witnesses relevant to this topic admit destruction of material relevant to this case was done. Addendum 170, again, evidence was destroyed by Rambis is as likely to have applied to any or all of his patents. It's all over the ALJ's decision here and that is clear. So, although Rambis likes to suggest they've produced everything that's been asked for, they've clearly destroyed lots of documents, some of which we don't even know what it is. And so, on that reason alone, under my country, it has to be remanded. But I don't want to lose the forest for the trees. We were discussing before that we are operating under a licensing and exclusion order that is costing this company significant funds every single day. And it's premised on the idea of an enforceable patent even though we have a finding in my country that exfoliated documents or finding here, even though in this case an exhausted opinion that that document destruction was in bad faith. And I do urge the court as soon as possible to vacate the exclusion order. Your Honor was talking about the public interest factor and how that weighs in. I think it does weigh in. The ITC does have a special obligation to make sure a party coming to it has clean hands, that it is an upstanding member of the public and I think that is a factor. Judge O'Malley, you asked me about the seriousness of the sanctions here, if they were to terminate. The district court, in a way, terminating them here is not as serious as terminating them in the district court because it wouldn't have collateral or self-effect. The dismissal here from the ITC would not be as harsh on Rambis as dismissing them from district court. On the 694 opinion, I'd like to direct the 694 opinion, Barber and Pioneer, whatever we call it. On page 13, I think we'll have to see Judge Clavenger, they make clear that neither the statute nor the legislative history suggests that Congress intended for the commission to credit a portfolio investment to a particular patent and that's at page 13. And they're just reading the statute consisting of the legislative history to say that a portfolio license payment is not enough. And what's going on here is exactly what you're going to reference. Wasn't the portfolio license issue just dropped out here because the ALJ is relying on the technology licenses? Well, but the technology license is a basket. It's the same basic point. I mean, the technology license is a basket. In amount, maybe. But it's the same problem. They can't link it up. But you want to reference the increasing use of the ITC by certain entities and that is what is going on here and I think stopping that type of forum shopping is certainly consistent with Congress' intent to limit the ITC to fundamentally as a trade forum as this court just said in the Mesolingua opinion. And so I will just end and I'll be on time this time, Your Honor, with a final point. Ramesses has obviously put this court to a tremendous amount of effort. There have been multiple appeals now standing for Ramesses' aggressive use of the patent system. I mean, there's been Infineon, there's been Heinlein, there's been Micron, and we're here now on this litigation all across the country. So to the extent the court is close on whether to remand on state prejudice or just end it now, I would urge the court to take that into account that the burden that Ramesses put on the litigation system should stop and it should stop now. Thank you, Your Honor. Thank you. Thank you all. The case is taken under submission. That concludes the arguments for this morning. All rise. The Honorable Court has served today. The Honorable Court  has served today. The Honorable Court has served today. The Honorable Court has served today.  has served today. The Honorable Court has served today. The Honorable Court has served today. The Honorable Court    The Honorable Court has served today. The Honorable Court has served today. The Honorable Court has served today. The Honorable Court has served today. The Honorable Court has served... The Hono... The Honora... The Honora...   The Honora...  has served today. The Honorable Court has served today. The Honorable Court has served today.  has served today.        have served today. The Honorable Cups have served today. The Honorable Bunch The Honorable Wigner  The Honorable Wigger One plate of Yo man way Wigger Wigger Wigur                        let                     but  uni   game was was did can well well well well    though  to  to to to to it